Nott, J.,
delivered the opinion of the Court.
The case comes before us upon the proofs of the claimant, and also upon a demurrer to the petition, which appears to have been subsequently interposed by the former Solicitor of the United States. In considering the case we have used these proofs for the purpose of sustaining, rather than of limiting or restricting, the petition, and with the intention of ordering an amendment should the evidence show that the claimants possess substantial and equitable grounds on which to rest a recovery.
It is claimed in this case that the United States pay to the executors of Judah Touro the value of the land in Louisiana whereon is situated Fort Jackson, and also for land around it to the extent of 1,500 Castilian “varas,” and for certain consequential damages to the residue of the plantation, amounting, according to the claimants’ witnesses, to the sum of $80,000.
The facts of the case are these :
In 1794, Anthony de St. Maxent, late captain in the Spanish service, petitions the governor general of Louisiana for a grant of land on the Mississippi, between Bayous Leard and Oarancoo, “in order to employ in the agriculture thirty-five negroes of his own.” He obliges himself, “ as the Fort Bourbon happens to be in the middle of this space oj ground,” “to clear all the ground” which the governor general shall describe to him “ as boundaries of said fort, and to carry the levee behind it.”
In 1795, the governor general issues an order of survey to the surveyor general, directing him to “ establish the petitioner upon the extension of land of about two leagues from the Bayou Leard to that *199 ■of Carancoo,” “-provided it be vacant, and that the location of this grant shall do no harm to anybody else, and under the following conditions :
“ 1. That by no means the grantee shall clear the lumber off the point which hides the Fort Bourbon.” * * *
“ 2. That within the distance of 200 toises from Fort Bourbon no building whatsoever shall be erected.” * * *
“ 3. That it is reserved for his Catholic Majesty the use of said lands ■situated between the Bayou, Beard and Carancoo, as aforesaid, whenever he shall want it for any fortification.

“ Upon which condition tke surveyor aforesaid shall draught theprocesverbal of survey of the land in question, and transmit the same to me, in order to provide the party the complete title and patent thereof.”

Spain next recedes the province of Louisiana to France by the treaty of Ildefonso, in 1800, and France, with the consent of Spain, cedes it to the United States in 1803 “forever and in full sovereignty.” Congress passes an act in 1805 (2 U. S. Laws, 324) establishing a board of commissioners, and providing, under certain conditions, that residents in the ceded province who hold warrants or orders of survey shall “ be confirmed in their claims to such lands in the same manner as if their titles had been completed;” and in 1806 a second act, (2 U. S. Laws, 391,) and in 1807 a third act, (2 U. S. Laws, 440,) whereby it is provided, upon certain conditions, that “ the decisions of the commissioners when in favor of the claimant shall be final against the United States.”
These commissioners, in 1809, give this decision on the claim of James Smith & Harris Hooe :
“ It appears that an order of survey for said land was duly issued by the Baron de Carondelet in favor of Anthony de St. Maxent, from whom the claimants derive their title, dated January 14, 1795, which the board do hereby confirm, agreeably to the terms and conditions specified in the petition, reserving to the United States the ground within two hundred toises of Fort Bourbon.”
Smith & Hooe next (it is assumed) transfer their interest in the property to Judah Touro, and the title sleeps till, in 1842, the United States establishes Fort Jackson. Five years later the General Land Office, pursuant to the opinion of Attorney General Clifford, tenders to Judah Touro a patent made out in the name of Smith & Hooe, or their legal representatives, &e., which reserves “to the United States, ■as a military reservation, the area ivithin the distance of 1,500 Cas *200 tilian varas from the most salient parts of the exilíeme outworks of Fort Jackson.” This patent Judah Touro refuses because of the reservation, and he protests that the United States are not entitled to make any reservation for Fort Jackson, and especially that they are not entitled to reserve any greater quantity than 200 toises, the extent, as he contends, reserved around Fort Bourbon. Judah Touro dies, and his executors appeal to Congress. The Judiciary Committee of the House of Representatives reports a bill favorable to the claimants in 1855, and the claim is subsequently (March 3, 1855) referred to this court.
That the United States succeeded to all the public property in Louisiana which had been possessed by the governments of France and Spain, is a conclusion for which it is needless to give reasons or cite authorities. The claimants only contend' that the United States did not succeed to the arbitrary power of taking private property for public (purposes without just compensation. But no such question arises in the case. The question is not whether the United States, as successor to the King of Spain, may take the property of Judah Touro without compensation, but whether it is the property of Judah Touro which has been taken. If Judah Touro did not own this property, as against the United States, he cannot be compensated for it; if the United States owned the property when taken for this purpose, they cannot be made to pay for taking their own. The counsel for the claimants cites the case of Polard v. Hagan, (3 Howard R., 225,) to show that the United States have not succeeded to the right of reentry. No such point is decided by that case. The question involved there was not whether the United States could succeed to all the rights-held by Spain, but whether they could dispose of those to which they had succeeded, as the Spanish government might have done. In the language of the Supreme Court, the question was whether “ the. Kiug of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives.”
The estate, hereditament, or interest reserved to his Catholic. Majesty in the tract granted to St. Maxent, was reserved not to the then King of Spain personally, but to the sovereign. “ The King never dies,” and conveyances to the government need not words of inheritance. Neither is the cession of territory ever contemplated in law; and it was as unnecessary for the reservation to say “ to the King and his assigns,” as to say “to the King and his successors.” The only question is, whether the thing reserved was of a nature trans *201 ferable, which might pass to the United States as public property held, by the Spanish Crown. Without stopping to discuss the nature of this estate, hereditament, or interest, it is enough to say that it was something for which the United States must now pay unless they owu it. Hence it was a thing of value — a property vested in the Crown; and hence it passed, as all public property in Louisiana passed, by the terms of the treaties, and became vested in the United States.
If it be said that this “use of the lands” is a usufruct granted by St. Maxent to the Spanish Crown and inalienable under the municipal law of Spain, it must be answered that, nevertheless, it passed as public property to the United States by the express terms of the treaties; for France ceded, with the consent of Spain, every interest which the Spanish King possessed. A treaty made “ under the authority of the United States” is made by the Constitution “the supreme law of the land.” In all courts of the United States it is a controlling authority and the highest and most decisive rule. Even, the constitutions of our own States when they conflict with its provisions are disregarded. No court of the United States can doubt or hesitate, because the plain provisions of a treaty may conflict, by chance, with the municipal law of a foreign government.
But the counsel for the claimants urges that although St. Maxent might have been dispossessed by the King of Spain, still, that under the treaty of 1803 he acquired the rights of an American citizen, and that those rights are greater than the rights of a Spanish subject. This is true; he did acquire new and greater rights, but they were political, not private rights. They were such rights as equally appertained to every citizen of the ceded province, and not such as gave to him peculiar advantages. They were the rights of a citizen, and not of an individual; and they gave to him no estate or interest in his property other than that which he had previously possessed.
It is also insisted that the acts of Congress relating to incomplete titles in Louisiana, and the proceedings thereunder, are conclusive against the United States. It is true that they are, within certain limits; but they only “ confirm’’ they do not enlarge, the estate of St. Maxent in this property. The act of 1805 provides that in certain cases, and under certain conditions, the holders of “ incomplete tilles ” “ shall be confirmed, in their claims to such lauds, in the same manner as if their titles had been completedand the act of 1807 provides that the commissioners “ shall have full power to decide according to the latos and established usages and customs of the French and Span *202 ish governmentsbut neither act releases to such claimants any estate or interest which, by the laws of France or Spain, had become the property of the United States. And the commissioners have essayed to do nothing more than that which was authorized by Congress ; for, after stating that they “ do hereby confirm, ” the order of survey, they, with proper precaution, add, “ agreeably to the terms and conditions specified in the petition.” Upon this point, therefore, there was no “ decision of the commissioners” “in favor of the claimant;” and it is only decisions which the act declares shall be “ final against the United States.”
This confirmation Smith & Hooe must be deemed to have accepted; and the presumption is that they conveyed the property to Judah Touro subject to the same terms and conditions. If so, these terms and conditions became a part of his bargain, and he was absolutely bound by them, and, after the lapse of half a century, could not evade them, as the claimants seek to do, by pronouncing them “an exaction inserted in the grant itself by the arbitrary power of a despotic government.”
Let us, however, examine the grant apart from any such estoppel, and as if it were presented by the original grantee. It is a well-settled rule that all grants from the King are to be construed strictly as against the grantee. In this instance the grant vrns in response to the petition of St. Maxent. There was no consideration given by him. The Spanish government gained nothing by making it. It was a grant, in the old and proper signification of the term — a mere gift— a favor from the sovereign. It therefore carries nothing by intendment, and deserves.no liberality of construction. Further than this, there was not even a patent. The “order of survey” was but an informal direction to an inferior officer to make a survey, with instructions “to draught the proces-verbal of survey of the land in question, and transmit the same to me, (the governor general,) in order to provide the party the complete title and patent thereof.” It might well have been intended by the governor general that when the patent should issue conditions and restrictions should be imposed, or at least that more guarded and precise terms should be employed.
But whatever the order of survey, limited by the petition of St. Maxent, gave or intended to give, has been given by the United States. We, therefore, must construe the “order of survey” and petition of St. Maxent as if a grant had actually been made embracing the provisions, limitations, and conditions of both.
*203 There appear to be three provisions in the order restrictive of the estate conveyed. 1. There is the condition that “by no means the grantee shall clear the lumber off” of a certain point below the fort. 2. There is another condition “ that within the diátance of 200 toises from Fort Bourbon no building whatsoever shall be erected,” and no canals or ditches dug “ that might incommode.” These are conditions in the nature of covenants by the grantee, running with the land, and covering only portions of the tract. 3. Then follows another provision, which is a general reservation, and is in these words:
“ 3d. That is reserved for his Catholic Majesty the use of such land situated between the Bayou Leard and Carancoo, as aforesaid, whenever he shall want it for any fortification.”
The order of survey does not in terms except Fort Bourbon from the grant. The claimants assume that it is reserved by the 2d provision of the order of survey, together with 200 toises of the land around it. But this is an error. That provision does not reserve anything; it simply prohibits the grantee from doing certain acts upon a certain part of the tract granted. He could use the land for agricultural purposes, but could not erect buildings; he might dig ditches and canals, but they must not be ditches or canals “ that might incommode.” As the 1st provision prohibiting the clearing of lumber from the point below the fort did not reserve the land, but only imposed a condition upon its use, so this 2d provision prohibiting the erection of buildings and digging of canals within 200 toises of the fort did not reserve the land, but only imposed another condition upon its use.
Fort Bourbon was not reserved unless included in the 3d provision. It was situated on the land “from Bayou Leard to that of Garancoo,” and all of that land passed by the terms of the grant. The 2d provision does not reserve the fort, but only inhibits St. Maxent from erecting buildings and digging canals “ that might incommode,” leaving him as free to use the land for agricultural purposes as any other portion of the tract. If the fort was not included in the general reservation of the 3d provision it was not reserved at all, and St. Maxent might have claimed immediate possession. St. Maxent never dreamed of acquiring anything of the kind, and the governor general manifestly supposed that he was reserving the “ use ” of this land for the fort. The fee, it was understood, passed under the general description in the order, viz : “ the extension of land of about two leagues from the Bayou Leard to that of Carancoo;” but the “use” of the land, so long as it was used for a “ fortification,” remained in the King of Spain. The original parties to the grant therefore gave to the reser *204 vation the same construction that is now contended for by the United States.
To this reservation, thus construed, the representatives of the grantee now raise several objections. “It was,” they say, “manifestly an exaction inserted in the grant itself by the arbitrary power of a despotic government. No subject would have voluntarily agreed to allow his lands and improvements to be taken at any time by his king, without compensation, for public purposes, if he had been left free to contract.”
But the agreement of St. Maxent was not only voluntary, but was clearly self-sought. He obtained for agricultural purposes, as a favor, upwards of 6,634 superficial arpents, (about 5,575 acres,) and he gave for this little or nothing. It was a grant both for his benefit and at his request. He took the risks of the government needing a part of the premises for other fortifications, and the chances of its surrendering the part already in use. This good fortune indeed seems to have been first realized. Fort Bourbon was first abandoned, and he or his successors obtained possession of its site. If St. Maxent could not (and did not) complain of the bargain which he voluntarily made, still less does it lie in the mouths of his successors to call this injustice — who have twice voluntarily (as we must assume) bought his bargain, and that with this reserved right of re-entry plainly and clearly expressed. It is not “an act of unmitigated tyranny,” as the counsel for the claimants term it, to enforce a bargain ; nor is the enforcement of this reserved right of re-entry upon its own estate by the government the taking of private property for public purposes.
The claimants also insist that this reservation “ means nothing more than the express recognition of the established prerogative of the sovereign, and there is no just reason to expand it and make it, in this case, confer something beyond the sovereign right as existing independent of contract.” They suggest that this power was “ to get rid of all embarrassments,” and to enable the King of Spain, “ by himself, and without the concurrence of any other power in the state, to erect fortifications on this particular tract.” We think it sufficiently clear that a very strong “ reason ” exists for holding this reservation to retain “ something beyond the sovereign right [of eminent domain] as existing independent of contract,” inasmuch as it was the only reservation made of Fort Bourbon; and as to the reason assigned for the introduction of so unnecessary a clause in a contract as this would be, thus construed, viz., that it was done to relieve one branch of the Spanish government from the “ embarrassments” of obtaining the con *205 currence of another branch of the same government “ to erect fortifications on this particular tract,” we deem it too fanciful to merit serious consideration.
Mr. K. J. Brent for claimants.
Mr. J. J. Weed, Assistant Solicitor, for the government.
The conclusions to which we have come are these :
1. The claimants have failed to show that Judah Touro was the legal representative of Smith & Hooe, and that omission is fatal.
2. There is no evidence to show that Judah Touro acquired title before the erection of Fort Jackson. If his title is subsequent, the damages were Smith & Hooe’s, and their claim is not assigned.
3. The claimants having failed to produce or account for the conveyances from St. Maxent to Smith &Hooe, and from Smith & Hooe to Judah Touro, the presumption is that those conveyances were made expressly subject to the reserved right of re-entry, and that thereby Judah Touro and his representatives are estopped from questioning the acts of the government, even though the original grantee might have done so.-'
4. The acts of Congress, and proceedings of the commissioners thereunder, only confirmed the estates in Louisiana already granted by the Spanish government; they neither enlarged the estate of St. Maxent, nor relinquished any right or interest vested in the United States as successors to the King of Spain.
5. The grant of the governor general, as confirmed by the United States, passed the fee of the entire tract, including the site of Fort Bourbon and the land around it, subject, always, to the right to use for fortifications any portion of the tract so granted. This reserved right passed to the United States under the treaty .of 1803, and may be enforced by them as fully as by their grantors — the governments of France and Spain.
6. The patent tendered to Judah Touro did not reserve any right of re-entry, but conveyed the laud (excepting that reserved for and around Fort Jackson) in fee simple absolute. For that grant there was no law, and to that extent the patent, was a new gratuity giving to Judah Touro more than he could lawfully ask. On the other hand, the patent should have provided for the surrender of the land taken for Fort Jackson whenever the United States should cease to use it as a fortification. But of that omission Judah Touro did not complain then, and his representatives cannot complain now.
The judgment of the court is that the petition he dismissed.
Loring, J., dissented.